UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**HARRY W. WRIGHT, JR.,**

        **Plaintiff,**

                                 **Case No. 2:10-cv-715**
**v.**                              **Judge Gregory L. Frost**
                                 **Magistrate Judge E.A. Preston Deavers**

**THE COUNTY OF FRANKLIN,
OHIO, et al.,**

        **Defendants.**

## OPINION AND ORDER

This matter is before the Court on the following filings—

(1)    The motion for summary judgment of Defendants Samantha Brammer and Laura Foreman (ECF No. 99), Plaintiff Harry W. Wright, Jr.'s memorandum contra (ECF No. 103), and Brammer's and Foreman's reply brief in support of summary judgment (ECF No. 105); and

(2)    The separate motion for summary judgment filed by Defendants Franklin County, Ohio, Franklin County Sheriff Zach Scott, James Karnes, Chief Deputy Mark Barrett, Correctional Care Plus, LLC, James Bloomfield LPN, Mohammed Abib, M.D., and Phillip Bialecki, M.D. (ECF No. 100), the "supplement" to these Defendants' motion for summary judgment (ECF No. 101), Plaintiff's memorandum contra (ECF No. 104), and Defendants' reply in support of summary judgment (ECF No. 109).

For the reasons set forth in more detail below, both summary judgment motions are **GRANTED IN PART AND DENIED IN PART**.  The Court finds that genuine issues of material fact exist for trial on the Plaintiff's claims for violations 42 U.S.C. § 1983 (Count I of the Amended Complaint) and for punitive damages as against Defendants Brammer, Foreman, Bloomfield, Dr. Abib, and Dr. Bialecki.  The Court also finds that genuine issues of material fact

remain for trial on Plaintiff's state-law claim for gross negligence (Count II of the Amended Complaint) against Defendants Brammer, Foreman, Dr. Abib, Dr. Bialecki, and Correctional Care Plus LLC.

## I. Factual Background

Three years ago, Plaintiff Harry W. Wright, Jr., was incarcerated as a pretrial detainee at the Franklin County Correctional Center ("FCCC"). Upon his admission to the facility on July 23, 2009, Plaintiff underwent a routine medical intake screening. During that screening, Plaintiff informed Carolann Huberston, a licensed nurse practitioner ("LPN"), that he was in pain and had been "spitting up blood" for the last three days. The intake screening form completed by Huberston suggests that she did not obtain any other medical information from Plaintiff. The form noted that Plaintiff would be assigned to the "General Population" at FCCC. On a separate form, however, Huberston indicated that Plaintiff would be a direct transfer to "medical." Consistent with that notation, Plaintiff was moved from the FCCC facility in downtown Columbus (where the intake was performed) to the FCCC's Jackson Pike facility; Plaintiff's understanding was that he was transferred to the Jackson Pike facility because the "medical ward" was located there. (Wright Dep. 22, ECF No. 99-1.)

Plaintiff was assigned to the jail's general population and placed on "nursing sick call" for follow up regarding the conditions he reported to Nurse Hubertson. During Plaintiff's first five days of incarceration, he complained on multiple occasions to the deputy on duty that he was in pain. But it was not until July 28, 2009, five days after his intake screening at the FCCC, that Plaintiff was taken to the medical ward at the jail. (*Id.* at 27.) According to Plaintiff, he was taken to the medical ward on that day after other inmates were "banging on the door" of their

cell to get the deputy's attention because Plaintiff was "spitting up blood in the toilet" and could not hold any food down.  (*Id.*)

The nurse who saw Plaintiff on July 28, 2009, documented the visit.  On the progress notes, the nurse indicated that a urine test revealed the presence of protein and a trace amount of blood.  (Pl.'s Memo. Contra to Mot. for Summ. J. Ex. 9.)  The nurse referred Plaintiff to a physician, Defendant Dr. Bialecki.  Dr. Bialecki was employed by Defendant Correctional Care Plus, LLC, which provided physicians to the FCCC under a contract with Franklin County.  Dr. Bialecki examined Plaintiff on July 29, 2009.

Dr. Bialecki documented on the progress notes that Plaintiff reported experiencing right-side abdominal and chest pain for the past 10 days.  (*Id.*)  Based on his examination, Dr. Bialecki suspected that Plaintiff had musculoskeletal issues and ordered x-rays of Plaintiff's abdomen and chest.  (Bialecki Dep. 68, ECF No. 99-4.)  Dr. Bialecki also ordered blood work to be done and prescribed Vicodin (pain medication) and Naprosyn (anti-inflammatory and pain medication) for Plaintiff.  (*Id.* at 68-69.)  Dr. Bialecki did not address the urinary findings documented by the nurse (*i.e.*, blood in the urine).

The day after Dr. Bialecki's examination, Plaintiff underwent the ordered laboratory tests and x-rays.  The blood tests revealed an elevated white blood cell count and elevated liver enzyme values. (Pl.'s Memo. Contra Ex. 13.)  The x-ray report regarding Plaintiff's abdomen stated that there was "no definite evidence of bowel obstruction" but also stated, "Clinical correlation is requested."  (*Id.*, Ex. 11.)  Both Plaintiff's and Defendants' experts testified that "clinical correlation is requested" means, in this instance, that the radiologist could not draw a diagnostic conclusion as to whether Plaintiff suffered from a bowel obstruction.  Rather, it was

up to the referring physician to exercise clinical judgment to determine whether an obstruction or some other medical problem existed.  (Hookman Dep. 84, ECF No. 102-1; Schirmer Dep. 75, ECF No. 108.)  Reaching that judgment could include reference to medical history, further examination, or further testing.  (Hookman Dep. 84; Bialecki Dep. 83-84, ECF No. 99-4.)  In this instance, Dr. Bialecki did not order any follow up with regard to Plaintiff's condition.  (Bialecki Dep. 88.)

On August 3, 2009, nearly one week after seeing Dr. Bialecki, Plaintiff submitted a Health Services Request to a nurse.  (Wright Dep. 34, ECF No. 99-1.)  In the request, Plaintiff again complained of "severe pain in my right side and chest" and asked for someone to "please help me and tell me what's wrong with me."  (Pl.'s Memo. Contra Ex. 7, ECF No. 104-1 at 11.)  Defendant James Bloomfield, LPN, received Plaintiff's Health Services Request the next day.  Nurse Bloomfield testified that he spoke with Plaintiff at "around midnight" on the night of August 3/early morning of August 4, 2009, at the request of a deputy.  (Bloomfield Dep. 21, ECF No. 100-6.)  Nurse Bloomfield noted that Plaintiff was complaining of chronic pain in his right side and that medication was not alleviating Plaintiff's pain.  (Pl.'s Memo. Contra Ex. 7, ECF No. 104-1 at 11.)  Nurse Bloomfield scheduled Plaintiff for a doctor sick call to take place later on August 4, 2009.  Nurse Bloomfield did not, however, document any further history related to Plaintiff's pain, obtain Plaintiff's vital signs, or otherwise examine Plaintiff. (Bloomfield Dep. 22.)  Nor did Nurse Bloomfield speak to deputies familiar with Plaintiff about Plaintiff's condition.  (*Id.* at 25.)  According to Nurse Bloomfield, Plaintiff "seemed fine" when he talked to Bloomfield.  (*Id.* at 24.)

Defendant Mohammad Abib, M.D., saw Plaintiff on August 4, 2009.  Dr. Abib noted that

Plaintiff "still" had "persistent" abdominal pain, but did not document any further history of Plaintiff's pain or obtain any vital signs.  (Pl.'s Memo. Contra Ex. 9, ECF No. 104-1 at 14.) Nor did Dr. Abib document the presence, absence, or quality of any bowel sounds.  According to Plaintiff's expert, Perry Hookman M.D., "[a]ny proper abdominal exam must include a determination of bowel sounds" because the absence of any bowel sounds "could indicate serious medical problems, including an obstructed bowel or a serious infection." (Dr. Hookman Report 5, ECF No. 102-8.)  Dr. Abib also did not address the elevated white blood cell counts that were indicated on Plaintiff's lab report from a few days earlier, findings that are commonly associated with acute bacterial infections.  (Dr. Goldenson Report 5, ECF No. 102-16.)

Dr. Abib diagnosed Plaintiff with hepatitis, re-prescribed Naprosyn, and noted "pain control" as the treatment plan.  (Pl.'s Memo. Contra Ex. 9, ECF No. 104-1 at 14.)  Dr. Abib testified that the only thing "impressive" to him about Plaintiff's lab reports were the liver enzymes, which suggested hepatitis and would be consistent with the pain Plaintiff was experiencing in the right upper quadrant of his abdomen.  (Dr. Abib Dep. 34, ECF No. 109-3.) Dr. Abib also observed that Plaintiff's abdominal pain did not appear to be "acute" based on his examination.  (*Id.* at 34-35.)  Dr. Abib further testified that he was unaware that Plaintiff had complained of abdominal pain since his arrival at FCCC on July 23, 2009; Dr. Abib knew only that Plaintiff had seen Dr. Bialecki about the same symptoms on July 29, 2009, six days before Dr. Abib examined Plaintiff.  (*Id.* at 35.)

On August 9, 2009, five days after Dr. Abib examined Plaintiff and 17 days after Plaintiff reported abdominal pain during his intake screening, an FCCC deputy brought Plaintiff to the medical ward at 5:30 a.m. after Plaintiff complained of having vomited bright red blood.

According to Plaintiff, one or more deputies at the jail saw him vomiting the blood.  (Wright

Dep. 41-42, ECF No. 99-1.)  Upon Plaintiff's arrival at the medical ward, Defendant Samantha

Brammer, LPN, placed Plaintiff in a holding cell for observation.  Plaintiff informed Brammer

that he usually vomited only once in the mornings; it is unclear from the progress notes whether

this meant (1) that Plaintiff vomited only once a day and did so in the morning or (2) that he

vomited multiple times daily but usually only once in the morning.  Regardless, at approximately

6:00 a.m., Brammer noted a scant amount of a "frothy pink substance in toilet" that Plaintiff

"claims he vomited."  (Pl.'s Memo. Contra Ex. 9, ECF No. 104-1 at 15.)  Brammer's work shift

ended at 6:00 a.m. and there is no documentation that Plaintiff was monitored further by the

medical staff on August 9, 2009 after Brammer left work.  (*Id.*; Brammer Dep. 35-37, ECF No.

99-2.)

With regard to the "frothy pink substance," Plaintiff testified that he vomited that

substance.  (Wright Dep. 43, ECF No. 99-1.) According to Plaintiff, Brammer looked at the

substance and told him it was "not enough."  (*Id.* at 136.)   As to her observations, Brammer

testified:

> [T]he fact I charted on here that [Plaintiff] said he usually only [vomits
> blood] one time a day in the morning is kind of a little fishy if you have something
> wrong with you.
> So dealing with the type of clientele that are there, I don't necessarily always
> believe the first thing, you know that – you have heroin addicts, all kinds of people
> that constantly have complaints, so I do need to see some sort of an evidence, x-rays,
> vital signs, or, obviously, if I had seen red blood that he was throwing up, I would,
> you know.

(Brammer Dep. 41, ECF No. 99-2.)

Though Brammer indicated that verification of the bloody vomit with "evidence" was

important, she did not take Plaintiff's vital signs, did not perform a guaiac test to determine

whether the substance in the toilet was blood, did not check for bowel sounds, did not inquire into Plaintiff's pain history or when he had his last bowel movement, did not assess Plaintiff's abdomen, and did not refer Plaintiff to see a doctor. (*Id.* at 44.) And notwithstanding Plaintiff's testimony that at least one deputy witnessed him vomiting blood before bringing him to the medical ward at 5:30 a.m. on August 9, 2009, there is no indication that Brammer asked the deputy who brought Plaintiff to the medical ward whether the deputy saw Plaintiff vomiting blood.

The next day, August 10, 2009, an FCCC deputy brought Plaintiff to the medical ward after Plaintiff again complained of "throwing up blood" and continued abdominal pain. (Pl's Memo. Contra Ex. 9, ECF No. 104-1 at 16.) Defendant Laura Foreman, LPN, was the charge nurse on duty at that time.[1] Foreman did not contact the on-call physician for further direction on how to treat Plaintiff; nor did she refer Plaintiff to the next sick call, even though Plaintiff told her that he had been experiencing persistent abdominal pain since July 23, 2009, and had been "seen by nursing staff multiple times for complaints of vomiting blood." (*Id.*) Rather, Foreman explained to Plaintiff that "vomit must be visualized, and in fact be verified." (*Id.*) Foreman took Plaintiff's vital signs and placed Plaintiff in a holding cell for observation. (*Id.*) Dr. Bialecki later (though it is unclear when) co-signed Foreman's progress note from August 10, 2009; there is no indication, however, that Dr. Bialecki evaluated Plaintiff's condition or otherwise examined him.

At some point on August 10, 2009, Plaintiff returned to his cell in the jail's general

---

[1]Since the events giving rise to this lawsuit, Defendant Laura Foreman's name has changed to Laura Barbee. To avoid confusion, the Court will continue to refer to her as Laura Foreman, the name under which she was sued in this action.

population.  Later that day, Plaintiff completed another Health Services Request form, which

stated: "I've been here throwing up blood, my right side is in severe pain, I'm in real bad pain

can you please help me find out what's wrong with me.  I can't hold no food down something is

seriously wrong with me."  (Pl.'s Memo. Contra Ex. 5, ECF No. 104-1 at 9.)  Defendant

Bloomfield received the request the following day.  Bloomfield did not examine Plaintiff, did not

contact the on-call physician, or refer Plaintiff to the next doctor's sick call.  Rather, Bloomfield

referred Plaintiff to nurse sick call.  (*Id.*)  Three days passed without Plaintiff being seen by any

medical staff in response to his August 10, 2009 Health Services Request.

On August 13, 2009, FCCC deputies again took Plaintiff to the medical ward in response

to Plaintiff's severe abdominal pain.  In this instance, Plaintiff needed to be transported to the

medical ward in a wheelchair because he could not walk.  (Wright Dep. 46, ECF No. 99-1.)  This

time, Plaintiff was rushed by ambulance to the emergency room at Grant Medical Center in

Columbus.  (Pl's Memo. Contra Exs. 4 and 5, ECF No. 104-1 at 7-9.)  At Grant, Plaintiff was

diagnosed with a small bowel obstruction and a mass in his colon.  Emergency exploratory

surgery revealed a colonic mass, a perforation in Plaintiff's colon, and an infection of his

abdominal cavity.  Plaintiff needed three additional surgeries to (1) remove part of his large

intestine, (2) disconnect the small intestine from the large intestine due to the amount of intra-

abdominal contamination caused by the perforated bowel, and (3) reconnect the small and large

intestines.  Plaintiff was also treated for multiple wound infections following these surgeries.


Plaintiff commenced this lawsuit on August 11, 2010.  In his Amended Complaint,

Plaintiff alleges that the Defendants' "deliberate indifference" to his serious medical needs

caused him to develop "a perforated intestine and a subsequent abdominal infection," which led to three surgeries and significant physical and emotional injuries.  (Am. Compl. ¶ 54, ECF No. 81.)  Plaintiff alleges claims for (1) violation of his civil rights under 42 U.S.C. § 1983 against all Defendants (Count I), (2) gross negligence under Ohio law against Dr. Bialecki, Brammer, Foreman, and Correctional Care Plus, LLC (Count II), and (3) intentional infliction of emotional distress under Ohio law against Dr. Bialecki, Brammer, Foreman, and Correctional Care Plus, LLC (Count III).  (*Id.*, ¶¶ 55-83.)

## II.  Discussion

In separate motions, all Defendants move for summary judgment in their favor.  (ECF Nos. 99, 100.)  Summary judgment is appropriate "if the movant shows that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  As the moving parties, Defendants bear the burden of showing the absence of a genuine issue of material fact as to at least one essential element of each of Plaintiff's claims.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).  To defeat summary judgment, Plaintiff must present sufficient evidence from which a reasonable jury could find in his favor.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  The Court must then determine "whether the evidence presents sufficient disagreement" for resolution by the jury or whether the matter "is so one-sided that [Defendants] must prevail as a matter of law."  *Id.* at 251-52.  In reaching its decision, the Court must view the factual evidence in a light most favorable to Plaintiff and draw all reasonable inferences in Plaintiff's favor.  *See Nat'l Enters., Inc. v. Smith*, 114 F.3d 561, 563 (6th Cir. 1997).

A.       **Plaintiff's Individual Capacity Section 1983 Claims**

Count I of Plaintiff's Amended Complaint alleges a claim under 42 U.S.C. § 1983.  To

prevail on a Section 1983 claim, a plaintiff must demonstrate (1) the deprivation of a right

secured by the Constitution or laws of the United States and (2) that a person acting under the

color of state law caused the deprivation.  *Dominguez v. Corr. Med. Servs.*, 555 F.3d 543, 549

(6th Cir. 2009).

Plaintiff contends that he was subjected to cruel and unusual punishment in violation of

his rights under the United States Constitution.  The Eighth Amendment "forbids prison officials

from 'unnecessarily and wantonly inflicting pain' on an inmate by acting with 'deliberate

indifference' toward [his] serious medical needs."  *Blackmore v. Kalamazoo Cnty.*, 390 F.3d

890, 895 (6th Cir. 2004) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S. Ct. 285, 50 L. Ed.

2d 251 (1976)).  Because he was a pretrial detainee during the events giving rise to the lawsuit,

Plaintiff's rights arise not under the Eighth Amendment, but under the analogous protections

afforded by the Due Process Clause of the Fourteenth Amendment.  *Id.* (*citing Bell v. Wolfish*,

441 U.S. 520, 545, 99 S. Ct. 1861, 60 L. Ed. 2d 447 (1979)).  "Whether a convicted prisoner or a

pretrial detainee, deliberate indifference to one's need for medical attention suffices for a claim

under 42 U.S.C. § 1983."  *Id.*

In a Section 1983 claim premised upon an allegedly unconstitutional denial of medical

care, an inmate must establish both objective and subjective components.  *Id.*  The objective

component requires the existence of a "sufficiently serious" medical need.  *Farmer v. Brennan*,

511 U.S. 825, 834, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994).  A "sufficiently serious" medical

need is one "that has been diagnosed by a physician as mandating treatment or one that is so

obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Harrison v. Ash*, 539 F.3d 510, 518 (6th Cir. 2008) (citations omitted).  The subjective element requires an inmate to show that prison officials have "a sufficiently culpable state of mind in denying medical care." *Blackmore*, 390 F.3d at 895 (internal quotations omitted) (quoting *Brown v. Bargery*, 207 F.3d 863, 867 (6th Cir. 2000)).  Officials have a sufficiently culpable state of mind where officials act with "deliberate indifference" to a serious medical need. *Farmer*, 511 U.S. at 834 (citations omitted).

The Supreme Court has defined "deliberate indifference" as being more than mere negligence but less than acting with purpose or knowledge. *Id.* at 835.  Instead, the prison official must have acted with a state of mind similar to recklessness. *Id.* at 836.  Thus, to prove the required level of culpability, a plaintiff must show that the official: (1) subjectively knew of a risk to the inmate's health, (2) drew the inference that a substantial risk of harm to the inmate existed, and (3) consciously disregarded that risk. *Id.* at 837; *see also Jones v. Muskegon Cnty.*, 625 F.3d 935, 941 (6th Cir. 2010).  A plaintiff is not necessarily required to prove that the prison official had actual knowledge of the substantial risk; "[w]hether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence . . . and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer* at 842; *see also Phillips v. Roane Cnty.*, 534 F.3d 531, 540 (6th Cir. 2008) ("Officials, of course, do not readily admit this subjective component, so 'it [is] permissible . . . to infer from circumstantial evidence that a prison official had the requisite knowledge.'") (quoting *Comstock* at 703).

11

On its face, the "deliberate indifference" standard appears to be an onerous one for a Plaintiff to establish, even at the summary judgment stage.  The Sixth Circuit has, however, counseled that—

> we do not demand that a plaintiff prove that he or she will ultimately be successful on the § 1983 claim at this stage in order to survive summary judgment. Instead, a plaintiff need only to "allege facts which, if true, would show that the official being sued perceived facts from which to infer substantial risk to the prisoner, that he [or she] did in fact draw the inference, and that he [or she] then disregarded that risk." [*Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001).]  This satisfies our twin goals of keeping the standard high enough so that it does not amount to mere negligence and low enough that it is possible for a plaintiff to survive summary judgment without proving his or her entire case.

*Cooper v. County of Washtenaw*, 222 F. App'x 459, 466-67 (6th Cir. 2007).  Consistent with this observation, the Sixth Circuit has noted that "less flagrant conduct" than that described in *Farmer* may constitute deliberate indifference in medical mistreatment cases.  *See Terrance v. Northville Regional Psychiatric Hosp.*, 286 F.3d 834, 843 (6th Cir. 2002).  For example, a finding of deliberate indifference can be supported by a showing of "grossly inadequate care as well as a decision to take an easier but less efficacious course of treatment," or "medical care which is so cursory as to amount to no treatment at all."  *Id.* (internal quotations omitted) (quoting *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999) and *Mandel v. Doe*, 888 F.2d 783, 789 (11th Cir. 1989)).

In this case, there is no serious dispute that the objective component of the deliberate indifference standard is satisfied.  As a result of the delay in diagnosis and treatment, Plaintiff was later rushed to the hospital and subjected to emergency surgery.  The nature of the condition further led to subsequent surgeries.  The fact that Plaintiff's condition led to emergency surgery satisfies the objective requirement of a "sufficiently serious" medical need.  *See Garretson v.*

12

*City of Madison Heights*, 407 F.3d 789, 797 (6th Cir. 2005) (finding that the plaintiff's

"emergency hospital admission coupled with a stay of several days" satisfied the objective

component of the deliberate indifference inquiry).  Thus, the critical issue on Defendants'

motions for summary judgment on Plaintiff's § 1983 claim is whether there is sufficient

evidence to establish the subjective component as to each individual Defendant.[2]

### 1.    Qualified Immunity

As an initial matter, individual Defendants Bialecki, Abib, and Bloomfield assert the

defense of qualified immunity to Plaintiff's Section 1983 claim.[3]  Under the doctrine of qualified

immunity, government officials performing discretionary functions are shielded from Section

1983 liability in their individual capacity "insofar as their conduct does not violate clearly

established statutory or constitutional rights which a reasonable person would have known."

*Phillips*, 534 F.3d at 538 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73

---

[2]One of the individual Defendants for whom summary judgment is purportedly sought is the late Sheriff James Karnes.  (Defs.' Mot. Summ. J. 1, ECF No. 100.)  Defendants ask that the claims against Karnes in his individual capacity be dismissed because (1)  Sheriff Karnes died on June 2, 2011 and (2) his estate was not substituted as a party under Fed. R. Civ. P. 25(a) with respect to the claims against Karnes in his individual capacity.  (Defs.' Mot. Summ. J. 24, ECF No. 100.)  For his part,  Plaintiff concedes that the individual capacity claims against the late Sheriff Karnes must be dismissed.  (Pl.'s Memo. Contra 27 n.2, ECF No. 104.)  In reality, this Court need not dismiss any claims against the late Sheriff Karnes in his individual capacity because none exist.  Though Plaintiff named Sheriff Karnes in his original Complaint in this action (ECF No. 2), his First Amended Complaint, filed with leave of Court on September 15, 2011, dropped Sheriff Karnes as a party in any capacity, as is proper under Fed. R. Civ. P. 15 and 21.  (Am. Compl. 1-2, ECF No. 81.)  Thus, Sheriff Karnes is not a party to this action.

[3]Sheriff Scott and Chief Deputy Barrett also purport to raise the defense of qualified immunity.  (Defs.' Mot. Summ. J. 16, ECF No. 100.)  As noted *infra*, however, Scott and Barrett are sued only in their respective official capacities, the equivalent to suing the County itself. Qualified immunity applies only to officials sued in their individual capacity.  *See Guest v. Leis*, 255 F.3d 325, 337 (6th Cir. 2001).

L. Ed. 2d 396 (1982)) (internal quotations omitted).  Thus, qualified immunity in any given case is determined by a two-part inquiry: (1) viewing the facts in the light most favorable to the plaintiff, has the plaintiff shown that a constitutional violation has occurred and (2) was the right clearly established at the time of the violation?  *Id.*

The qualified immunity question is complicated here by the fact that two of the Defendants asserting the defense, Dr. Bialecki and Dr. Abib, were not employees of Franklin County.  Rather, these doctors were employed by Defendant Correctional Care, LLC, which provided physicians to FCCC under a contract with Franklin County.  The Sixth Circuit has held that the qualified immunity defense is not available to private defendants working under a contract with a government entity, at least insofar as the claims at issue involve liability for acts amounting to deliberate indifference or recklessness.  *See Harrison*, 539 F.3d at 521-25.  Thus, Sixth Circuit precedent dictates that Drs. Bialecki and Abib cannot raise qualified immunity as a defense to Plaintiff's Section 1983 claim.  The qualified immunity defense would appear to be available only to Bloomfield, who was a County employee during the events underlying Plaintiff's claims.

Ultimately, however, the unavailability of qualified immunity to Drs. Bialecki and Abib is of little significance to this Court's analysis.  Defendants base their qualified immunity argument solely on the first prong—the issue of whether a constitutional violation has occurred.  Defendants make no argument that the alleged constitutional violation was not "clearly established" for purpose of the second prong of a qualified immunity analysis.  Thus, the resolution of the motions for summary judgment on Plaintiff's Section 1983 claim depends solely on the issue of whether there is a genuine issue of material fact as to whether a

constitutional violation occurred. That analysis is identical with respect to all of the individual defendants, regardless of whether qualified immunity is available him or her.

### 2. Dr. Bialecki

Plaintiff contends that Dr. Bialecki was deliberately indifferent to his medical needs with regard to what turned out to be Plaintiff's serious medical condition. (Am. Compl., ¶ 74, ECF No. 81.) Dr. Bialecki examined Plaintiff on July 29, 2009, and concluded that Plaintiff suffered from a musculoskeletal problem. Dr. Bialecki prescribed pain and anti-inflammatory medication and also ordered lab tests and x-rays to be performed on Plaintiff. While Plaintiff's experts questioned Dr. Bialecki's examination of Plaintiff, Dr. Bialecki was not viewed as having been "deliberately indifferent" toward Plaintiff's medical needs during the July 29, 2009 evaluation of Plaintiff's condition. (Goldenson Dep. 50, ECF No. 102-13.)

Plaintiff's case for deliberate indifference against Dr. Bialecki rests primarily on his experts' opinions concerning Dr. Bialecki's actions *after* that, namely, during the three-day period before Plaintiff was rushed to the hospital for what turned out to be an emergency surgery. Some 12 days after Dr. Bialecki examined Plaintiff, Nurse Foreman entered a progress note that described Plaintiff's complaints of severe abdominal pain and vomiting blood — the same symptoms that prompted Dr. Bialecki to examine Plaintiff on July 29, 2009. Though the date on which he did so is unclear, it is not disputed that Dr. Bialecki signed off on the progress note. Supported by his experts' testimony, Plaintiff contends that Dr. Bialecki was deliberately indifferent toward Plaintiff's medical needs by signing off on the progress note without ordering further examination (*e.g.*, a referral to a gastroenterologist), treatment, or follow-up. Because Dr. Bialecki was familiar with the fact that Plaintiff had reported the same serious symptoms

15

since July 23, 2009 — nearly three weeks before Nurse Foreman's progress note — Plaintiff contends that Dr. Bialecki was deliberately indifferent to do nothing in response to a progress note showing the same symptoms.

For their part, Defendants contend that it is speculative to assume that Dr. Bialecki read Nurse Foreman's progress note on August 10, 2009 or at any other time before Plaintiff was rushed to the hospital on August 13, 2009. The timing of Dr. Bialecki's review of the progress note is a key point, as Plaintiff's experts concede that they base their opinions concerning Dr. Bialecki's neglect of Plaintiff's medical needs on the premise that Dr. Bialecki saw the progress note *before* Plaintiff's condition worsened to the point of having to be rushed to the hospital. (Goldenson Dep. 48-49, ECF No. 102-13; Hookman Dep. 116, ECF No. 102-2.) But the timing of Dr. Bialecki's review of the August 10, 2009 progress note simply highlights the existence of a genuine issue of material fact for the jury. If the jury concludes that Dr. Bialecki signed off on the note *before* Plaintiff's emergency transport to the hospital and credits the opinions of Plaintiff's experts, the jury could further conclude that Dr. Bialecki was deliberately indifferent to Plaintiff's serious medical needs. *See Dominguez*, 555 F.3d at 551 (finding that a delay in providing care to an inmate with a known serious condition may constitute deliberate indifference); *Terrance*, 286 F.3d at (noting that " 'deliberate indifference may be established by a showing of grossly inadequate care as well as a decision to take an easier but less efficacious course of treatment'") (quoting *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999)).

To be sure, Dr. Bialecki disputes this characterization of his actions and, for that matter, Plaintiff's similar theory with regard to Defendants Abib and Bloomfield. Defendants Bialecki, Abib, and Bloomfield argue that *Terrance* and *Dominguez* do not govern this Court's analysis in

16

this case because the Sixth Circuit has "consistently recognized the difference in 'deliberate indifference analysis when the case concerns an immediate threat (e.g. heart attack, or diabetic shock) to an inmate's life and when the matter concerns 'chronic symptoms' about which a prisoner complains (e.g. ongoing pain)." (Defs.' Reply 7, ECF No. 109 (emphasis omitted).) Citing *Mabry* for this proposition, Defendants argue that Plaintiff cannot show a genuine issue of material fact regarding deliberate indifference because he was never suffering from an "immediate threat" to his life until August 13, 2009, at which time Plaintiff was rushed to the hospital.

   *Mabry* does not, however, stand for the proposition that these Defendants posit. In *Mabry*, the Sixth Circuit assessed if the record revealed a genuine issue of material fact regarding whether a doctor who treated an inmate "subjectively perceived facts from which to infer substantial risk to the prisoner [and] that he did in fact draw the inference." *Mabry* at 901 (quoting *Comstock*, 273 F.3d at 703). *Mabry* recognized that "a genuine issue of material fact as to deliberate indifference can be based on a strong showing on the objective component." *Id.* at 901-02 (quoting *Estate of Carter v. City of Detroit*, 408 F.3d 305, 313 (6th Cir. 2005)). The Court found that the inmate's "chronic symptoms" were not severe enough to, without more, create a genuine issue of material fact. In contrast, the *Carter* and *Garretson* cases involved "immediate threats to an inmate's life." *Id.* at 902. In those situations, the objective component is itself so strong that the denial of medical care creates a genuine issue of material fact for trial on the subjective component. *See Farmer*, 511 U.S. at 842 ("a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious").

   Properly construed, all *Mabry* stands for is the proposition that chronic conditions of a

17

less than life-threatening nature do not obviate the need for an inmate to show facts from which a reasonable jury could find the subjective component of deliberate indifference.  To the extent the Defendants use *Mabry* for the proposition that "chronic conditions" cannot be the predicate of a deliberate indifference claim, Defendants are simply misreading *Mabry*.

Amid Plaintiff's persistent complaints of vomiting blood and severe (and worsening) abdominal pain, the jury could find that Dr. Bialecki failed to do more upon reading the August 10, 2009 progress note despite the knowledge of a substantial risk of serious harm.   Plaintiff has therefore presented sufficient evidence to show a genuine issue of material fact for trial on the issue of whether Dr. Bialecki was deliberately indifferent for purposes of Plaintiff's § 1983 claim.

### 3.      Dr. Abib

Defendants' argument as to Dr. Abib is fairly simple: they argue that Dr. Abib's diagnosis of hepatitis was consistent with the symptoms presented by Plaintiff and that any criticism of Dr. Abib's diagnosis and treatment is simply a dispute over a care decision, a dispute not cognizable in a Section 1983 claim.  *See Estelle*, *supra*.  In support of their argument, Defendants note that Plaintiff's expert, Dr. Goldenson, acknowledged during his deposition that hepatitis was consistent with Plaintiff's symptoms and "probably" an accurate diagnosis. (Goldenson Dep. 91, ECF No. 102-13.)

The problem with Defendants' argument is that it understates the scope of the allegations and evidence related to Dr. Abib's conduct.  Just one page after the deposition testimony relied upon by Defendants for the notion that Dr. Goldenson "admits" that Dr. Abib's diagnosis of hepatitis was "probably" accurate, Dr. Goldenson levied criticism that cannot be characterized as

simply a dispute over a care decision. Dr. Goldenson recited a litany of basic things that Dr. Abib should have done in order to properly evaluate Plaintiff's condition on August 4, 2009, including (1) getting a history related to Plaintiff's abdominal pain, (2) listening for bowel sounds, (3) exploring the reasons behind Plaintiff's elevated white blood cell count, and (4) ordering follow-up to monitor Plaintiff's condition in order to determine if there was a serious problem. (*Id.* at 92-93.) The failure of Dr. Abib to check for bowel sounds in response to Plaintiff's complaint of severe abdominal pain is particularly significant, as both of Plaintiff's experts note that the absence of bowel sounds are associated with serious medical problems, such as an obstruction or infection. (Goldenson Report 8, ECF No. 102-16; Hookman Report 5, ECF No. 102-8.) In his expert report, Dr. Goldenson opined that Dr. Abib's performed an "extremely cursory and inadequate evaluation" of a patient complaining of abdominal pain.

The cursory nature of Dr. Abib's diagnosis is further evidenced by his continued prescription of non-steroidal anti-inflammatory drugs ("NSAIDs"). Dr. Hookman opined that NSAIDs are associated with "colonic perforation in diverticular disease," and that prescribing them to patients with diverticular disease "carries an increased risk of colonic perforation" among other complications. (Hookman Report 4, ECF No. 102-8.) Dr. Abib did not take this into account. Equally significant, Dr. Abib did not consider a differential diagnosis, thereby ignoring the possibility of other causes of Plaintiff's symptoms. A jury could conceivably find that Dr. Abib was deliberately indifferent to Plaintiff's medical needs by jumping to the diagnosis of hepatitis to the exclusion of any other condition and continuing to prescribe NSAIDs that could have had a detrimental effect on Plaintiff's health.

Further evidence of deliberate indifference can be gleaned from Dr. Abib's the hepatitis

19

diagnosis itself.  Notably, Dr. Abib reached the diagnosis without documenting Plaintiff's medical history related to symptoms *other* than abdominal pain, such as nausea, vomiting, fever, fatigue, loss of appetite, headache, or color changes in Plaintiff's urine.  (Dr. Goldenson Report 8, ECF No. 102-16.)  Thus, there is at least some evidence from which a jury could find there was little clinical basis for Dr. Abib's hepatitis diagnosis, which could in turn lead a jury to conclude that Dr. Abib acted in such a cursory fashion as to provide no treatment to Plaintiff whatsoever.  Moreover, Dr. Abib took no steps to isolate Plaintiff even though hepatitis type A is a viral infection.  (*Id.* at 9.)  This factor could also suggest to a reasonable trier of fact that Dr. Abib was deliberately indifferent toward Plaintiff.  Because a reasonable physician would have taken additional steps to treat a patient diagnosed with hepatitis, a jury could question whether Dr. Abib consciously disregarded a risk he perceived with regard to Plaintiff's medical needs.

While it is true that courts are reluctant to second guess the medical judgment of prison doctors, it is also true that prison officials "may not entirely insulate themselves from liability under § 1983 simply by providing some measure of treatment."  *McCarthy v. Place*, 313 F. App'x 810, 814 (6th Cir. 2008).  Indeed, a plaintiff may show deliberate indifference when "it can be shown that a defendant rendered 'grossly inadequate care' or made a 'decision to take an easier but less efficacious course of treatment.'" *Id.* (quoting *Terrance*, 286 F.3d at 843); *see also Jones v. Muskegon Cnty.*, 625 F.3d at 944-45.  Based on the summary judgment evidence in this case, a reasonable jury could find that Dr. Abib was deliberately indifferent.  There is a genuine issue of material fact with regard to whether Dr. Abib's examination of Plaintiff was so cursory as to be grossly inadequate, which would support a deliberate indifference finding under Sixth Circuit precedent.  *See, e.g., Terrance*, 286 F.3d at 843-44.  A reasonable jury could find

that Dr. Abib summarily concluded that Plaintiff had hepatitis without regard to whether Plaintiff's symptoms could have been indicative of a much more serious medical condition.

### 4.       Nurse Bloomfield

Defendant Bloomfield moves for summary judgment on the basis that his actions were appropriate in response to Plaintiff's complaints and did not constitute deliberate indifference. (Defs.' Mot. Summ. J. 23, ECF No. 100; Defs.' Reply 12, ECF No. 109.)  Bloomfield argues that the only "criticism" of his actions by Plaintiff's expert is that he did not immediately call a doctor to find out what was wrong when he received Plaintiff's Health Services Request on August 10, 2009.  (Goldenson Dep. 50, ECF No. 102-13.)  Bloomfield argues that "in light of the fact Plaintiff was essentially making the same complaints for which he had been treated on July 29 and August 3, and the fact that Bloomfield had been interacting with Plaintiff on a daily basis since August 4 and observed no signs of distress, Bloomfield's action to refer the Plaintiff to the next nurse sick call for evaluation (usually conducted within 24 hours) does not demonstrate deliberate indifference of any serious medical need."  (Defs.' Mot. Summ. J. 23, ECF No. 100.)

Bloomfield's argument could eventually carry the day with the jury.  But it might not. To accept Bloomfield's argument would be to construe the facts most favorably in Bloomfield's favor instead of the Plaintiff's — something this Court cannot do at the summary judgment stage.  Based on the summary judgment evidence presented, a jury could reasonably find that Bloomfield displayed deliberate indifference toward Plaintiff's medical needs.

In particular, Bloomfield's argument for summary judgment rests on the factual premise that he observed Plaintiff "daily" in the week prior to Plaintiff submitting his Health Services Form on August 10, 2009, complaining again of severe abdominal pain and throwing up blood.

21

But Bloomfield does not direct the Court to the part of the record that demonstrates this supposed "daily" monitoring by Bloomfield.  Moreover, Dr. Goldenson's opinion with regard to Bloomfield's actions is not as limited as Bloomfield would have the Court believe.  Dr. Goldenson testified at length about why Bloomfield's failure to call a doctor to examine Plaintiff in response to his Health Services Request was deliberately indifferent, regardless of whether Bloomfield (as Bloomfield contends) "talked" to Plaintiff personally the same night as the request was sent—

> Q.   Would it then change your mind with respect to whether or not Nurse Bloomfield was deliberately indifferent?
>
> A.   Well, I don't know what you mean by talking, but, you know, he needed to be examined.  He needed to be seen by a doctor.
> . . .
> And an LPN can't make independent treatment decisions.  He needed to call the doctor.  So even if Nurse Bloomfield had gone to see Mr. Wright – you know, since there is no note here all we have is that he's complaining of severe pain, and we know two days later he was – what his condition was, there would have been something that would have caused someone to respond two days earlier if he had been seen.

(Goldenson Dep. 51-52, ECF No. 102-13.)  Plaintiff's other expert, Dr. Hookman, similarly opined that Bloomfield's actions were highly suspect.  By referring Plaintiff to nurse sick call instead of calling a doctor, in the face of a patient with continual complaints of abdominal pain and throwing up blood, Dr. Hookman testified that "Nurse Bloomfield did virtually nothing to help this patient when the patient needed the most help."  (Hookman Dep. 97, ECF No. 102-1.)

Bloomfield's argument that Plaintiff was "essentially making the same complaints for which he had been treated on July 29 and August 3" does not advance his summary judgment argument.  Quite the opposite, this argument demonstrates that Bloomfield had some indication that Plaintiff was suffering from serious symptoms for nearly two weeks.  Yet, Bloomfield chose

to defer Plaintiff to a nurse sick call for an indefinite time.  A reasonable jury could decide that Bloomfield was deliberately indifferent in that he had some knowledge of Plaintiff's symptoms and their duration, yet chose simply to ignore Plaintiff.

Plaintiff's arguments relating to Bloomfield's actions go beyond merely a dispute about the "basic exercise of medical judgment."  (Defs.' Reply 13, ECF No. 109.)  Indeed, Plaintiff has submitted evidence from which a reasonable jury could conclude that Bloomfield *failed* to exercise judgment and instead chose to ignore serious symptoms that ultimately led to Plaintiff having to undergo multiple major surgeries.  Whether Bloomfield was deliberately indifferent toward Plaintiff is a jury question and not an issue worthy of resolution on summary judgment.

### 5.    Nurses Brammer and Foreman

In their own separate motion, Defendants Brammer and Foreman also seek summary judgment in their favor.  (ECF No. 99.)  Brammer and Foreman contend that they could not have been deliberately indifferent to Plaintiff's medical needs, given that they only "had Wright's complaints of pain and vomiting, but no objective indicators of any trouble."  (*Id.* at 7.)  They argue that Plaintiff's medical record at the time they were confronted with Plaintiff's complaints showed no abnormality that should have triggered more action on their part.  (*Id.*)  Without subjective knowledge of Plaintiff having a serious medical need, Brammer and Foreman argue that there is no basis upon which to find that they were deliberately indifferent toward Plaintiff.

With regard to the conduct of Brammer and Foreman, *Jones v. Muskegon Cnty.* is instructive.  There, the Sixth Circuit reversed a summary judgment in favor of two nurses who had received medical kites from an inmate complaining of persistent abdominal pain.  *Jones*, 625 F.3d at 943-44.  The court found a genuine issue of material fact because the evidence, construed

23

in the light most favorable to the plaintiff, suggested that the nurses "chose to ignore [plaintiff inmate's] requests, concluding instead that he was 'faking it.'" *Id.* at 944.  The choice to ignore the inmate's complaints led to a delay in medical treatment for the inmate, who eventually died of a large cancerous mass.  The court found that this evidence was sufficient to raise a genuine issue of material fact as to whether the nurse defendants "knew of the risk to Jones's health, yet consciously disregarded the risk." *Id.*

*Jones* informs the result in this case as to the conduct of Defendant nurses Brammer and Foreman.  As to Brammer, she was on duty when a deputy brought Plaintiff to the medical ward at 5:30 a.m. on August 9, 2009, complaining of vomiting blood.  Despite this information and the information that Plaintiff had suffered identical symptoms since his arrival at FCCC on July 23, 2009, Brammer did little more than send Plaintiff to a holding cell for "observation."  Even after she observed a "pink frothy substance" in the holding cell toilet, Brammer still did not call a doctor to examine Plaintiff.  Rather, it appeared that Brammer treated Plaintiff's reported symptoms with skepticism—

> I know that I've been an LPN for a while and the fact that - - you know, first of all, there's a pink substance he claims is blood.  Usually if somebody is vomiting blood, it's either a bright red or it's a black coffee ground.  It's blood for your - - if you're vomiting, it's from your stomach.  Usually that's what that is.
>
> And also the fact I charted on here that he said he usually does it one time a day in the morning is kind of a little fishy if you have something wrong with you.
>
> So dealing with the type of clientele that are there [in the jail], I don't necessarily always believe the first thing, you know, that - - you have heroin addicts, all kinds of people that constantly have complaints, so I do need to see some sort of an evidence, x-rays, vital signs, or, obviously, if I had seen red blood that he was throwing up, I would, you know.

(Brammer Dep. 41, ECF No. 109-7.)  Particularly in light of this testimony, and as was the case in

24

*Jones*, a reasonable jury could find that Brammer simply ignored Plaintiff and concluded he was "faking it." *Jones* at 944. Despite Brammer's insistence on seeing "evidence" of Plaintiff's symptoms, she took no steps to corroborate them. Brammer did not take Plaintiff's vital signs or take any steps to determine whether the substance in the toilet was blood. Brammer simply held him for observation for a half hour until her shift ended, with no indication that she alerted the next duty nurse to continue monitoring. (Pl.'s Memo. Contra Ex. 9, ECF No. 104-1 at 15.) And even though Brammer's notes indicate that Plaintiff reported having vomited "bright red blood," Brammer did not recall whether she asked the deputy who brought Plaintiff to the medical ward about whether that was true. (Brammer Dep. 26, ECF No. 99-2.) That simple inquiry may have yielded the confirmation Brammer insisted upon: indeed, Plaintiff testified that the deputy saw him vomit blood before taking him to the medical ward. (Wright Dep. 38, ECF No. 100-1.)

Citing many of these same actions and inactions, Plaintiff's expert, Dr. Goldenson, was pointed in his assessment of Brammer's culpability in this case—

> Q.    Okay. And your criticism of Brammer is that she should have done what?
>
> A.    Well, you know, one, he's complaining of vomiting bright red blood. She doesn't ask him how much he's vomiting. She doesn't ask him if he's having abdominal pain, which is something you would generally ask someone if they are vomiting. How long it's been going on, about how much. She – – she didn't examine him. Again, if someone's vomiting blood, you'd want to examine their belly and see what was going on.
>
> And then what I was saying before is you can get postural vital signs, which is getting blood pressure, pulse stand – – lying and standing, to see if there's any change indicating blood loss. . . .
>
> But my main complaint is that she didn't refer him on to the doctor or the nurse and ask for direction from them what to do, you know, calling them and saying, "I've got this guy who says he's been puking up bright red blood. What do you want me to do?"

(Goldenson Dep. 134-35, ECF No. 102-14.)

Viewing the evidence in the light most favorable to Plaintiff, as the Court must at this stage, a reasonable jury could find that Brammer was deliberately indifferent by choosing to ignore Plaintiff's reported symptoms rather than try to determine whether something was seriously wrong with him.

For similar reasons, Nurse Foreman is likewise not entitled to summary judgment. Foreman had contact with Plaintiff on August 10, 2009 when Plaintiff was again brought to the FCCC medical ward by a deputy. At that time, Plaintiff again complained of throwing up blood and having severe abdominal pain. (Pl.'s Memo. Contra Ex. 9, ECF No. 104-1.) Plaintiff also indicated that his pain had persisted since the time he entered the jail on July 23, 2009. (*Id.*) In response, Foreman informed Plaintiff that his vomiting of blood had to be "verified" as a prerequisite to treatment and noted that she would "continue to monitor" Plaintiff's condition. (*Id.*) Yet, there is no documentation of any further monitoring of Plaintiff.

Moreover, there is evidence in the record that Foreman may have disregarded FCCC protocol for inmates complaining of abdominal pain and vomiting. The protocol in place at the relevant time required that an inmate complaining of such symptoms be placed on the next doctor's sick call. (Pl.'s Memo. Contra Ex. 3, ECF No. 104-1.) But Foreman did not contact a doctor on August 10, 2009 when faced with Plaintiff's serious complaints and she did not even refer Plaintiff for the next doctor's sick call. (*Id.*, Ex. 9.) And though Foreman informed Plaintiff that vomit must be "visualized" before medical attention would be provided, she did not examine Plaintiff or otherwise perform any evaluation to see if there were objective findings to be made regarding Plaintiff's abdominal pain.

26

Similar to Brammer, a reasonable jury could find that Foreman did basically nothing in the face of alarming symptoms, which later proved to be the precursor to a serious gastrointestinal issue that required multiple surgeries. Rather than examine Plaintiff, Foreman arguably ignored him until the situation got worse. Under these circumstances, there is a genuine of fact for trial regarding whether both Brammer and Foreman were deliberately indifferent to Plaintiff's medical needs.

**B.      Section 1983 Claims Against Franklin County, Sheriff Scott, and Chief Deputy Barrett**

A local government entity cannot be held liable under Section 1983 on a theory of respondeat superior for an injury inflicted solely by its employees. *Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 694, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978). Section 1983 liability against a political subdivision may attach only where the "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury" complained of. *Id.* To be successful, the plaintiff must "identify the policy, connect the policy to the [local government] itself and show that the particular injury was incurred because of the execution of that policy." *Coogan v. City of Wixom*, 820 F.2d 170, 176 (6th Cir. 1987). In other words, the local government policy or custom must be the "moving force" behind the behind the violation of the plaintiff's constitutional rights. *Board of Cnty. Commrs. of Bryan Cnty. v. Brown*, 520 U.S. 397, 405, 117 S. Ct. 1382, 137 L. Ed. 2d 626 (1997).

For the claims against Sheriff Zach Scott and Chief Deputy Mark Barrett in their official capacity, the analysis is the same. Suits against government officers in their official capacity are the equivalent of suing the government entity itself. *Kentucky v. Graham*, 473 U.S. 159, 165-66,

27

105 S. Ct. 3099, 87 L. Ed. 2d 114 (1985).

Plaintiff identifies three policies or customs upon which he bases Section 1983 liability against the County and official-capacity defendants.  First, Plaintiff contends he has a colorable Section 1983 claim against Sheriff Scott for "his reckless training of the medical staff at FCCC." (Pl.'s Memo. Contra 28, ECF No. 104.)  Second, Plaintiff argues that Franklin County has an unlawful official policy of permitting LPNs to practice "outside their scope of practice," namely by making independent treatment decisions without consultation with a registered nurse or physician.  (*Id.* at 32-33.)  Finally, Plaintiff contends that the FCCC custom requiring that "vomit must be verified" before providing medical care displayed deliberate indifference to his medical needs.  (*Id.* at 34.)  The Court considers and rejects all of these theories of entity and official-capacity liability.

### 1.       Failure to Train

Plaintiff cites a "failure to train" as a county policy or custom for which Section 1983 liability attaches.  Plaintiff's theory of liability is that Franklin County and Sheriff Scott (in his official capacity) were "reckless" in their training of FCCC medical staff to "properly recognize and diagnose serious medical conditions."  (Pl.'s Memo. Contra 28, ECF No. 104.)

"In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983."  *Connick v. Thompson*, 131 S. Ct. 1350, 1359, 179 L. Ed. 2d 417 (2011).  A "failure to train" theory of liability is a difficult one to establish: the Supreme Court has noted that a municipality's culpability for a deprivation of rights "is at its most tenuous where a claim turns on a failure to train."  *Id.* (citing *Oklahoma City v. Tuttle,* 471

28

U.S. 808, 822–823, 105 S.Ct. 2427, 85 L.Ed. 2d 791 (1985)). A failure to train "must amount to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact.'" *Id.* (quoting *Canton v. Harris*, 489 U.S., at 388, 109 S.Ct. 1197).

There are two ways in which a plaintiff can demonstrate a local government or government official's need to act in the training context. The plaintiff can present evidence showing the local government's "actual knowledge of a deficiency with the existing policy or training (or lack thereof), such as where there have been recurring constitutional violations." *Heyerman v. County of Calhoun*, 680 F.3d 642, 648-49 (6th Cir. 2012). Alternatively, the plaintiff can show that the local government's "need to act should have been plainly obvious to the [municipality's] policymakers, who, nevertheless, are deliberately indifferent to the need." *Id.* at 649 (internal quotations omitted) (quoting *Canton v. Harris*, 489 U.S. at 390 n.10). This type of situation arises "in a narrow range of circumstances" where "a violation of federal rights may be a highly predictable consequence" of the local government's failure to act. *Id.* The oft-cited example, posited by the Supreme Court in *Canton v. Harris*, is the one where city policymakers know that their police officers will be required to arrest fleeing felons and provide them with guns for that task. *Canton* at 390 n.10. In that context, the need to train the officers in the constitutional limitations on using deadly force is so obvious that a failure to train could be properly characterized as deliberate indifference to constitutional rights. *Id.*

In making his "failure to train" claim, Plaintiff relies on the deposition testimony of Janine Gillispie, the Health Services Administrator for the FCCC. Gillispie testified that in 2009 there was no orientation process under which nurses working for Maxim Health Care Services (the nurse staffing service that employed Defendants Foreman and Brammer) received a copy of the

29

FCCC's written nursing protocols.  (Gillispie Dep. 29-30, ECF No. 106.)  Defendant Brammer corroborated this testimony in her deposition, indicating that she was not required to participate in any formal orientation or training on the various nursing policies and protocols of FCCC when she started working there in 2004.  (Brammer Dep. 9, ECF No. 99-2.)  Plaintiff argues that his lack of training for the nurses at FCCC led directly to Brammer and Foreman violating various FCCC policies applicable to, among other things, (1) inmates who were (like Plaintiff) placed in observation cells when brought to the medical ward and (2) medical observation of inmates complaining of abdominal pain or vomiting blood.  Thus, Plaintiff contends that a reasonable jury could find that Franklin County and the Sheriff's Office were deliberately indifferent in that they simply threw the Maxim nurses "right into the pool to see if they could swim" without training them in the proper protocols for handling medical complaints in the jail.  (Pl.'s Memo. Contra 31, ECF No. 104.)

The Court is not persuaded by Plaintiff's argument.  As a factual matter, the record does not support the premise that the Maxim nurses were not trained in FCCC's policies and procedures applicable to nurses at the jail.  While Gillispie testified that there was no "sit down" orientation process for Maxim nurses during the time period relevant to this, she also testified that Maxim nurses like Brammer and Foreman received on-the-job training.  (Gillispie Dep. 28-29, ECF No. 106.)  Brammer likewise testified that she received on-the-job training when she began working at FCCC.  (Brammer Dep. 9, ECF No. 99-2.)  Thus, at *best*, Plaintiff's failure-to-train claim is based on little more than an argument that the Sheriff's Office and the County did not do enough to ensure that the Maxim nurses were familiar with the policies applicable to inmates needing medical care.  But in the situation where a local government "does create reasonable

30

policies, but negligently administers them, there is no deliberate indifference and therefore no §

1983 liability." *Perez v. Oakland Cnty.*, 466 F.3d 416, 430 (6th Cir. 2006) (internal quotations

omitted).

Apart from being factually flawed based on the record before the Court, Plaintiff's "failure

to train" theory of liability is unsupported by the applicable law.  Ordinarily, a Section 1983

plaintiff must demonstrate a "pattern of similar constitutional violations" to support a finding of

deliberate indifference on a failure-to-train theory of liability.  *Connick*, 131 S. Ct. at 1360.

Alternatively, a Section 1983 plaintiff can establish so-called "single-incident" liability by

demonstrating that a constitutional violation of which he complains is the "obvious consequence"

of failing to provide specific training.  *Id.* at 1361; *see also Canton v. Harris*, 489 U.S. at 390

n.10.  Plaintiff has made neither showing here.

Plaintiff directs the Court to no evidence and makes no argument to show that there has

been a "pattern" of constitutional violations similar to the one of which he complains in this case.

Nor has he argued that this is the rare case in which a constitutional violation is an "obvious

consequence" of Franklin County and/or the Sheriff's Department providing the specific training

he claims should have been given to Brammer and Foreman in this case.  Plaintiff argues simply

that specific training would have been the better practice and that a jury "could make a reasonable

inference" that better training would have led to Plaintiff having his serious medical needs met

more adequately.  (Pl.'s Memo. Contra 31, ECF No. 104.)  But this is a far cry from presenting

evidence to support a finding that the need for different training for the Maxim nurses like

Brammer and Foreman was "so obvious" that the County and Sheriff's Office can be said to have

acted with deliberate indifference. "[S]howing merely that additional training would have been

31

helpful in making difficult decisions does not establish municipal liability." *Connick*, 131 S. Ct. at 1363.

### 2. LPNs Practicing "Outside the Scope"

Plaintiff also argues that he has shown a genuine issue with regard to the existence of an official policy or custom of allowing LPNs to independently assess and treat patients, thereby allowing LPNs to practice outside the scope of their expertise and their statutory authorization under Ohio law. (Pl.'s Memo. Contra 31-32, ECF No. 104.) This theory is exceedingly weak and cannot survive summary judgment.

Ohio law permits LPNs to operate under the supervision of a licensed physician or registered nurse. Ohio Rev. Code § 4723.01.[4] Plaintiff contends that many of the actions taken

---

[4]Ohio Rev. Code § 4723.01(F) defines the "practice of nursing as a licensed practical nurse" as—

> providing to individuals and groups nursing care requiring the application of basic knowledge of the biological, physical, behavioral, social, and nursing sciences at the direction of a licensed physician, dentist, podiatrist, optometrist, chiropractor, or registered nurse. Such nursing care includes:
>
> (1) Observation, patient teaching, and care in a diversity of health care settings;
>
> (2) Contributions to the planning, implementation, and evaluation of nursing;
>
> (3) Administration of medications and treatments authorized by an individual who is authorized to practice in this state and is acting within the course of the individual's professional practice, except that administration of intravenous therapy shall be performed only in accordance with section 4723.17 or 4723.171 of the Revised Code. Medications may be administered by a licensed practical nurse upon proof of completion of a course in medication administration approved by the board of nursing.
>
> (4) Administration to an adult of intravenous therapy authorized by an individual who is authorized to practice in this state and is acting within the course of the individual's professional practice, on the condition that the licensed practical nurse is authorized under section 4723.17 or 4723.171 of the Revised Code to perform intravenous therapy and performs intravenous therapy only in accordance with those sections.

by LPN Huberston and LPN Defendants Bloomfield, Brammer, and Foreman were tantamount to independent assessment and treatment decisions made without consultation with a registered nurse or licensed physician.  The problem with Plaintiff's argument, however, is that he has cited no evidence from which to conclude that there was a *custom or policy* of allowing LPNs to make independent assessment and treatment decisions.  At most, Plaintiff has established that the LPNs acted improperly—arguably, with deliberate indifference on the part of Defendants Brammer, Foreman, and Bloomfield—in failing to consult with a registered nurse or licensed physician during one or more Plaintiff's visits to the FCCC medical ward.  But without evidence of a policy or custom of allowing LPNs to diagnose and treat inmates without supervision by registered nurses or licensed physicians, he cannot show that the action of the Sheriff's Office or the County was the "moving force" behind the alleged constitutional violations.

Rather than show that the LPNs were acting pursuant to a policy or custom in committing the acts (and omissions) of which he complains, Plaintiff has done the opposite:  he has provided evidence that the LPNs acted *contrary* to applicable policies at FCCC.  Indeed, elsewhere in his opposition to Defendants' motion for summary judgment, Plaintiff emphasizes written policies that were *not* followed by Defendants Bloomfield, Brammer, and Foreman.  For example, Plaintiff argues that Defendants Brammer and Foreman neglected to follow procedures and policies applicable when placing an inmate in a holding cell for observation.  (Pl.'s Memo. Contra 29, ECF No. 104 (citing *id.* Ex. 22).)  Most notably, Plaintiff contends that Defendants Brammer and Foreman violated FCCC procedure and protocol by failing to refer Plaintiff to the next doctor's sick call when he was taken to the medical ward with reported symptoms of severe abdominal pain and vomiting of blood.  (*Id.* at 30.)

33

Plaintiff cannot have it both ways: he cannot on the one hand cite to policies and procedures that the LPNs failed to follow with respect to referring Plaintiff for examination and treatment by a physician, yet on the other hand argue that the LPNs were authorized by an unwritten and unspoken policy or custom that empowered LPNs to act outside the scope of proper LPN practice.  On the evidence before the Court, Plaintiff has failed to create a genuine issue of fact on the question of whether a "policy or custom" allowed LPNs to act outside the scope of their authorized practice.[5]

### 3.    Verifying Vomit

Plaintiff also argues that the County's policy requiring "verification or visualization of vomit" before providing medical care to an inmate who reports having vomited blood was a "barrier to patient care" that constitutes deliberate indifference and violated his constitutional rights.  (Pl.'s Memo. Contra 34-35, ECF No. 104.)  As to this policy allegation, Plaintiff cites testimony from Defendant Foreman, who testified that it was "pretty standard procedure" to verify or visualize vomit before providing medical attention in response.  (Foreman Dep. 38-40.)  Dr. Bialecki testified similarly at his deposition.  (Bialecki Dep. 106, ECF No. 99-4.)  Further bolstering this argument, Plaintiff points to Defendant Brammer's deposition, during which

---

[5]Further, even if the Court indulges Plaintiff's argument that there was a "policy" or "custom" of allowing the LPNs to make medical decisions, Plaintiff's Section 1983 claim against the County may still not survive.  The Court of Appeals addressed a similar argument in *Graham v. County of Washtenaw,* 358 F.3d 377 (6th Cir. 2004), where the plaintiff alleged that (1) there was a policy in the county jail that allowed LPNs make treatment decisions that were beyond the scope of their competence under Michigan law and (2) the policy led to his being housed in the general population instead of receiving emergency medical treatment.  *Id.* at 383-84.  The Sixth Circuit rejected the argument on the basis that it was not unconstitutional for a county to have a policy of deferring to the judgment of medical professionals.  *Id.* at 384.  The Court was not persuaded by the allegation that LPNs were allegedly acting outside the scope of their permitted practice under state law.

Brammer testified that she would need to see "some sort of evidence" before she would believe the inmate's report of vomiting blood.  (Brammer Dep. 41, ECF No. 99-2.)

Plaintiff cannot sustain a Section 1983 claim based on this theory, for he has failed to make the requisite showing of a "policy" or "custom" upon which to impose liability on the County.  A "policy" includes some "policy statement, ordinance, regulation, or decision officially adopted and promulgated" by the government or by a government official in his or her official capacity.  *See Powers v. Hamilton Cnty. Pub. Defender Comm'n*, 501 F.3d 592, 607 (6th Cir. 2007) (quoting *Monell*, 436 U.S. at 690) (internal quotations omitted).  While Plaintiff has cherry picked fleeting references to a "policy" from the depositions of Nurse Foreman and Dr. Bialecki, he has failed to show evidence of a "policy" in the *Monell* sense.  In other words, Plaintiff has not shown that the so-called "policy" of verifying vomit was something in the nature of a "policy statement, ordinance, regulation, or decision officially adopted and promulgated" by the County or by the Sheriff's Office.  Accordingly, Plaintiff has not shown a "policy" upon which to moor his claim of County liability under Section 1983.

Nor has Plaintiff demonstrated the existence of an actionable "custom."  In contrast to a "policy," a "custom" for Section 1983 purposes is something that has not received formal approval through official decision making channels but has nonetheless become a practice so well-settled as to have the force of law.  *Monell*, 436 U.S. at 690-91.  To show the existence of a "custom," a Section 1983 plaintiff must show "that policymaking officials knew about and acquiesced in the practice at issue."  *Powers* at 607 (citing *Memphis, Tenn. Area Local, Am. Postal Workers Union v. City of Memphis*, 361 F.3d 898, 902 (6th Cir. 2004)).  Plaintiff has shown no evidence to support such a "custom" here.  Plaintiff has, at best, shown evidence that

Dr. Bialecki, Nurse Foreman, and Nurse Brammer believed that some "verification" of an inmate's vomit was required before treatment would ensue.  Missing from Plaintiff's evidence, however, is an indication that the Sheriff's Office or the County knew about or acquiesced in this alleged "policy."  Without such evidence, Plaintiff cannot rely on "verification of vomit" as a custom upon which to base Section 1983 liability.

In short, Plaintiff has not identified a "policy" or "custom" upon which to base Section 1983 liability against the County or the Defendants sued in their official capacity.  The Court accordingly **GRANTS** summary judgment in favor of Franklin County, Sheriff Scott, and Chief Deputy Barrett.

### C.        Section 1983 Claims Against Correctional Care LLC

Plaintiff's Amended Complaint alleges a Section1983 claim against Correctional Care LLC, the private entity that provided physicians and nurses pursuant to a contract with Franklin County.  A private contractor performing a traditional state function on behalf of a local government may be liable as a state actor for its own policy or custom that violates a plaintiff's constitutional rights.  *Johnson v. Karnes*, 398 F.3d 868, 877 (6th Cir. 2005).  Correctional Care moves for summary judgment on the ground that Plaintiff cannot demonstrate an actual policy or custom of Correctional Care that resulted in a violation of his constitutional rights.

Plaintiff does not oppose Correctional Care's summary judgment argument, instead conceding that the Section 1983 claims against Correctional Care should be dismissed.  (Pl.'s Memo. Contra 35, ECF No. 104.)  In light of Plaintiff's concession, the Court **GRANTS** summary judgment in favor of Correctional Care on Count I of the Amended Complaint.

### D.    State Law Claim for Gross Negligence

In Count II of the Amended Complaint, Plaintiff alleges a claim entitled "Gross

Negligence, Willful and Wanton Misconduct in Withholding Necessary Medical Care." (Am.

Compl. 17, ECF No. 81.) Plaintiff brings this claim against only Defendants Dr. Bialecki, Nurse

Brammer, Nurse Foreman, and Correctional Care Plus, LLC. (*Id.* at ¶ 74.)[6] Plaintiff presumably

includes Correctional Care Plus LLC under a respondeat superior theory, as it was Dr. Bialecki's

employer during the events giving rise to Plaintiff's claims.

"Gross negligence" under Ohio law is defined as the "failure to exercise any or very slight

care" or "a failure to exercise even that care which a careless person would use." *Thompson*

*Elec., Inc. v. Bank One, Akron, N.A.*, 37 Ohio St. 3d 259, 265, 525 N.E. 2d 761 (1988). In this

case, Defendants Bialecki, Brammer, and Foreman all argue that summary judgment is

appropriate because there is no genuine dispute that they exercised "at least slight care" in their

---

[6]Defendants Bloomfield, Abib, and Franklin County expended a portion of their summary judgment briefing arguing that they are immune from liability on Plaintiff's state-law claims under Ohio Rev. Code § 2744.02 and/or § 2744.03. (Defs.' Mot. Summ. J. 29-32, ECF No. 100.) In a supplement to their motion, these Defendants clarified their position, arguing that there are *no* pending state-law claims against Dr. Abib or Bloomfield because (1) the Amended Complaint did not allege any against them and (2) this Court earlier denied Plaintiff's motion to amend the complaint to add state-law gross negligence and intentional infliction of emotional distress claims against Dr. Abib and Bloomfield. (Defs.' Supp. to Mot. Summ. J. 1-2, ECF No. 101; Opinion and Order 6-8, ECF No. 76.) Confusingly, Plaintiff's Memorandum Contra Defendants' Motion for Summary Judgment admits that he does not assert state-law claims against Defendants Abib and Bloomfield, yet inexplicably expends two pages arguing why Bloomfield is not entitled to immunity under Ohio law. (Pl.'s Memo. Contra 36-37, ECF No. 104.) Lest there be any confusion, the Court expressly observes here that the state law claims asserted in Counts II and III of Plaintiff's Amended Complaint are alleged only as against Defendants Dr. Bialecki, Brammer, Foreman, and Correctional Care Plus, LLC. (Am. Compl. ¶¶ 74-77, ECF No. 81.) The County, Dr. Abib, and Foreman are *not* defendants as to the state-law claims asserted in Counts II and III. Thus, the Court need not decide whether Bloomfield is entitled to statutory immunity under Ohio law.

treatment of Plaintiff.  (Defs.' Mot. Summ. J. 9, ECF No. 99; Defs.' Mot. Summ. J. 35, ECF No. 100.)  In response, Plaintiff contends that his care was so inadequate by these Defendants that it amounted to no care at all, such that there is a genuine issue of material fact as to whether the Defendants were grossly negligent.  (Pl.'s Memo. Contra 17-18, ECF No. 103; Pl.'s Memo. Contra 41-42, ECF No. 104.)

Though Defendants would have this Court conclude that they exercised "at least slight care," it is inappropriate for the Court to grant summary judgment on that basis.  In light of the Court's analysis of the "deliberate indifference" issue, there remains a jury question as to whether the Defendants' treatment of Plaintiff was so cursory as to amount to no treatment at all.  In the context of Section 1983 claims by inmates, the Supreme Court has equated "deliberate indifference" with "*recklessly* disregarding the risk" of harm.  *Farmer*, 511 U.S. at 836 (emphasis added); *see also Comstock*, 273 F.3d at 703.  In turn, Ohio cases have considered gross negligence to be the equivalent of recklessness.  *See, e.g., Universal Concrete Pipe Co. v. Bassett*, 130 Ohio St. 567, 200 N.E. 843 (1936); *Said v. Slabe Mach. Prods. Co.*, 11th Dist. No. 93-L-089, 1994 Ohio App. LEXIS 2754, at *7 (June 24, 1994); *Plotnick v. State Med. Bd. Of Ohio*, 10th Dist. No. 1973 Ohio App. LEXIS 1641, at *25 (Mar. 6, 1973).  Because this Court has found a genuine issue of material fact with respect to "deliberate indifference" under the law of Section 1983,  it logically follows that there remains a genuine issue fact with regard to "gross negligence" under Ohio tort law.  Whether the Defendants' actions rose to the level of gross negligence or recklessness is an issue for a jury to resolve in this case.

The Defendants' motions for summary judgment as to Count II of Plaintiff's Amended Complaint are **DENIED**.

### E.   State Law Claim for Intentional Infliction of Emotional Distress

Count III of Plaintiff's Amended Complaint alleges a state-law claim for intentional infliction of emotional distress ("IIED").  The elements of an IIED claim in Ohio are (1) that the defendant intended to cause emotional distress or knew or should have known that the actions taken would result in serious emotional distress to the plaintiff; (2) that the defendant's conduct was extreme and outrageous, (3) that the defendant's conduct proximately caused the plaintiff's psychic injury; and (4) that plaintiff's emotional distress was so serious that no reasonable person could be expected to endure it.  *Ekunsumi v. Cincinnati Restoration, Inc.*, 120 Ohio App. 3d 557, 562, 698 N.E. 2d 503 (1997).

Defendants argue that Plaintiff's evidence is lacking on all four elements.  This Court need not look beyond the fourth element—the requirement of *serious* psychological injury—to dispose of this claim.  Plaintiff has not cited any record evidence that would warrant a jury's reasonable inference that Plaintiff has suffered the serious emotional injury that is required to prove IIED in Ohio.  Indeed, Plaintiff's deposition testimony indicated a *lack* of serious emotional injury associated with the serious medical condition and delayed treatment thereof.  Plaintiff denied needing psychological or psychiatric treatment, noting he was "a pretty strong individual." (Wright Dep. 63, ECF No. 100-1.)  Plaintiff also characterized it as a "fair" statement that he had not suffered any mental or emotional injuries as a result of the incident.  (*Id.* at 64.)

Apart from Plaintiff's testimony failing to support it, Plaintiff's IIED claim suffers from a want of evidence generally.  A plaintiff claiming severe and debilitating emotional injury must present some evidence in support of his claim, such as expert testimony concerning psychological injury or lay witness testimony concerning changes in the plaintiff's emotional condition, to

prevent summary judgment in favor of the defendant.  *Ford Motor Credit Co. v. Ryan*, 189 Ohio

App. 3d 560, 590, 939 N.E. 2d 891, 2010-Ohio-4601.  Plaintiff has not presented such evidence

here.  While Plaintiff might theoretically recover noneconomic damages if he were to prevail in

this case before a jury, he has not created a genuine issue of material fact that would warrant a

judgment in his favor on a stand-alone IIED claim under Ohio.  Summary judgment in

Defendants' favor on Count III is **GRANTED.**

     **F.**    **Punitive Damages**

     In his prayer for relief, Plaintiff's Amended Complaint seeks punitive damages against all

Defendants, "jointly and severally."  (Am. Compl. 20, ECF No. 81.)  Defendants Franklin

County, Sheriff Scott, Chief Deputy Barrett, Correctional Care Plus LLC, Bloomfield, Abib, and

Bialecki move for summary judgment on the issue of punitive damages, arguing that they are not

recoverable as a matter of law.[7]

     As to Franklin County, Sheriff Scott, and Chief Deputy Barrett, the issue of punitive

damages is moot.  The Court has found no basis for liability against Franklin County or against

Scott and Barrett in their respective official capacities.  *See* Section II.B., *supra*.  In any event,

Plaintiff did not oppose summary judgment as to these Defendants on the issue of punitive

damages; Plaintiff argues only that the motion for summary judgment on punitive damages should

be denied as to Defendants Bloomfield, Abib, Bialecki, and Correctional Care Plus LLC.  (Pl.'s

Memo. Contra 42, ECF No. 104.)

     As to Defendants Bloomfield, Abib, and Bialecki, the Court denies their summary

---

     [7]Defendants Brammer and Foreman do not move for summary judgment on the issue of
punitive damages.

judgment motion with regard to punitive damages under Section 1983. Punitive damages are available under Section 1983 when a defendant's conduct is proven to be motivated by "evil motive or intent" or when it involves "reckless or callous indifference to the federally protected rights of another." *Smith v. Wade*, 461 U.S. 30, 56 (1983). The Sixth Circuit has found that this punitive damages standard is "consistent" with a jury finding of "deliberate indifference" on the liability issue in a Section 1983 case. *See Gibson v. Moskowitz*, 523 F.3d 657, 664 (6th Cir. 2008). And in this case, as in *Gibson*, the Court finds that the evidence bearing on the deliberate indifference issue is also relevant to a jury's determination of whether punitive damages are appropriate. *See id.* Accordingly, Defendants Bialecki, Bloomfield, and Abib are not entitled to summary judgment on punitive damages as it relates to Plaintiff's Section 1983 claim.

As to the state-law claim for "gross negligence" asserted in Count II of Plaintiff's Amended Complaint, Defendants Bialecki and Correctional Care Plus move for summary judgment on punitive damages, arguing that Plaintiff cannot satisfy the Ohio standard of "actual malice." *See* Ohio Rev. Code § 2315.21(C)(1). Ohio law governing punitive damages defines "actual malice" as "(1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, *or* (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm." *Preston v. Murty*, 32 Ohio St. 3d 334, 336, 512 N.E. 2d 1174 (1987) (emphasis added). At the very least, Plaintiff has raised a genuine issue of material fact as to the second definition of "actual malice."

As set forth previously, Plaintiff has demonstrated a genuine issue of material fact on the questions of whether Dr. Bialecki was deliberately indifferent to Plaintiff's medical needs while he was incarcerated at FCCC. The "deliberately indifferent" standard of liability for purposes of

41

Section 1983 is at least equivalent to a finding of recklessness, as is a finding of gross negligence under Ohio law.  *See Farmer*, 511 U.S. at 836 (equating deliberate indifference with recklessness); *Universal Concrete Pipe*, 130 Ohio St. at 576 (equating gross negligence with "reckless disregard").  This is significant, as Ohio law recognizes recklessness as a culpable state of mind sufficient to satisfy the "actual malice" standard for punitive damages.  *See Vilella v. Waikem Motors*, 45 Ohio St. 3d 36, 37, 543 N.E. 2d 464 (1989) ("actual malice can be inferred from conduct and surrounding circumstances which may be characterized as reckless, wanton, willful or gross"), *modified on other grounds by Moskowitz v. Mt. Sinai Med. Ctr.*, 69 Ohio St. 3d 638, 635 N.E. 2d 331 (1994).  Accordingly, the same facts this Court found to create a genuine issue of material fact on Plaintiff's Section 1983 and state-law gross negligence claims likewise create a genuine issue of material fact for trial on Plaintiff's prayer for punitive damages.  Defendants' motion for summary judgment on the issue of punitive damages is therefore **DENIED.**

### III.  Conclusion

This case boils down to a dispute over whether the doctors and nurses who were responsible for treating Plaintiff actually discharged their duty or whether they were deliberately indifferent to a serious medical condition that ultimately led to a multitude of painful surgeries for Plaintiff.  For the reasons set forth above, this Court finds there are genuine issues of material fact that preclude judgment as a matter of law as to Defendants Bialecki, Abib, Bloomfield, Brammer, Foreman, and Correctional Care Plus LLC.

Accordingly, the motion for summary judgment of Defendants Brammer and Foreman (ECF No. 99) is **GRANTED IN PART AND DENIED IN PART** as follows:

42

- Summary judgment is **GRANTED** as to Count III of Plaintiff's Amended Complaint, alleging intentional infliction of emotional distress;

- Summary judgment is **DENIED** as to Counts I and II of Plaintiff's Amended Complaint alleging violation of 42 U.S.C. § 1983 and a state-law claim for gross negligence, respectively.

The motion for summary judgment of Defendants Franklin County, Sheriff Scott, Chief Deputy Barrett, Dr. Bialecki, Dr. Abib, Bloomfield, and Correctional Care Plus, LLC (ECF No. 100) is **GRANTED IN PART AND DENIED IN PART** as follows:

- As to Defendants Franklin County, Sheriff Scott, and Chief Deputy Barrett, summary judgment is **GRANTED** in their favor on the entirety of Plaintiff's Amended Complaint;

- As to the 42 U.S.C. § 1983 claim alleged in Count I of Plaintiff's Amended Complaint, the motion for summary judgment is **DENIED** as to Defendants Bialecki, Abib, and Bloomfield and **GRANTED** as to Defendant Correctional Care Plus, LLC;

- As to the state-law gross negligence claim alleged in Count II of Plaintiff's Amended Complaint, the motion for summary judgment of Defendants Bialecki and Correctional Care Plus, LLC is **DENIED**;

- As to Defendants Abib, Bloomfield, Bialecki, and Correctional Care Plus, LLC, the motion for summary judgment on the issue of punitive damages is **DENIED**; and

- As to the state-law claim for intentional infliction of emotional distress alleged in

Count III of Plaintiff's Amended Complaint, the motion for summary judgment is

**GRANTED**.

**IT IS SO ORDERED.**

                       **/s/ Gregory L. Frost**
                       **GREGORY L. FROST**
                       **UNITED STATES DISTRICT JUDGE**